Filed 6/3/26  P. v. Duran CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087610 |
| Plaintiff and Respondent, | (Super. Ct. No. RIF2203730) |
| v. | |
| JOSHUA JESSE DURAN, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Affirmed as modified.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, A. Natasha Cortina and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Joshua Jesse Duran, Jr., a member of the Mi Gangsta Familia (MGF) gang, shot and killed 33-year-old Brian Davis because he mistakenly believed Davis was a member of a rival gang.  A jury found Duran guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)) and returned a true finding on a gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)).  The jury also returned a true finding on a sentencing enhancement allegation that Duran personally and intentionally discharged a firearm proximately causing great bodily injury or death to another person.  (§ 12022.53, subd. (d).)  The trial court sentenced Duran to prison for life without the possibility of parole (LWOP) for the murder conviction, plus a consecutive indeterminate term of 25-years-to-life for the firearm enhancement.

On appeal from the judgment of conviction, Duran presents three claims of error.  First, he contends the trial court erred by permitting the prosecution's gang expert to relate case-specific testimonial hearsay in violation of state law and the confrontation clause of the Sixth Amendment to the federal Constitution.  Second, he asserts the evidence was insufficient to support the gang-murder special circumstance finding.  Third, he argues the court erred by imposing (and then staying) a $10,000 parole revocation fine under section 1202.45.  The People dispute Duran's first two claims, but concur with his third argument that the parole revocation fine was unauthorized.

We agree the court erred by imposing the parole revocation fine because Duran's sentence does not include a period of parole, but reject

---

[1]    Further undesignated statutory references are to the Penal Code.

Duran's other contentions.  Therefore, we strike the parole revocation fine and affirm the judgment as modified.

## II

## BACKGROUND

A. *Prosecution Case*

    1. *Shooting of Brian Davis*

On the afternoon of June 21, 2022, Brian Davis was sitting on his bicycle at the corner of Melody Lane and Hickory Lane in Riverside, waiting to meet his children after school so he could walk them to his father's nearby home on Hickory Lane.  Two rival gangs, MGF and Black Star Mafia, claimed the area as their respective territories.  Black Star Mafia consists primarily of African American members and uses the logo of the Dallas Cowboys football team as its symbol.  Davis, an African American man, was not a member of any gang.  However, he was wearing a Dallas Cowboys football jersey that fateful afternoon.

While Davis was waiting for his children, Davis's father waived hello to his son from his home, got into his car, and started reversing his car down his driveway.  As he did so, he saw a black four-door car parked catacorner from his home.  The car was registered to 20-year-old Yaneli Martinez.  Martinez was in the front passenger seat and her mother, Florecita Ponce, was in the driver seat.  Ponce's romantic partner, Duran, and Martinez's boyfriend, Elias Fakhoury, were in the backseat.

Davis's father felt something was not "normal" because the occupants of the car were staring in Davis's direction.  The car had also been parked for about 15 to 20 minutes, which "felt funny" to Davis's father.  He put his car into park and exited the car to investigate.  At that point, the black car sped past Davis's father and pulled up next to Davis.

3

Duran and Fakhoury exited their car and aggressively confronted Davis, who was unarmed. Davis got off his bicycle and assumed a defensive posture, as if he was preparing to fight. Duran said something to Davis, pulled out a gun, and fired several shots at Davis. Davis tried to flee, but Duran pursued him and kept shooting, causing Davis to fall to the ground. Duran continued to shoot Davis as he lay on the ground. Duran and Fakhoury rejoined their companions and the black car drove away.

Davis died at the scene after sustaining five gunshot wounds, including two gunshot wounds to the back of the head, one gunshot wound to the chest, one gunshot wound that traveled through his left arm and entered his chest, and one gunshot wound to the buttock.

2. *Investigation and Arrest*

Law enforcement officers responded to reports of the shooting and recovered seven nine-millimeter shell casings from the crime scene. They also observed divots in the grass near Davis's body, which was consistent with the shooter firing at Davis while he was on the ground.

A neighbor's home security surveillance system captured the shooting on video. Law enforcement officers were unable to positively identify the suspects from the surveillance footage alone, but they learned the suspects' physical characteristics and the make, model, and year of Martinez's car from the footage.

Nine days after the shooting, investigators received an anonymous tip that a car matching the description of the suspect vehicle was parked at a motel in Colton. The investigators located the vehicle and surveilled the motel, which led them to identify Duran, Fakhoury, Martinez, and Ponce as the suspects implicated in Davis's murder.

Investigators then obtained a search warrant for the phone numbers registered to Duran and Martinez. Cell phone data for the phone numbers placed both suspects' phones in the area of the crime scene at the time of the shooting. The cell phone data also showed both phones traveling together towards Colton after the shooting.

About three weeks after the shooting, officers stopped Martinez's car and arrested its occupants, including Duran, Fakhoury, Martinez, and Ponce. During a subsequent search of the car, officers recovered a loaded black Smith and Wesson nine-millimeter firearm from the backseat. It had one round in the chamber and three rounds in the magazine. Officers also recovered a loaded black and tan nine-millimeter pistol with an extended magazine from the front passenger floorboard. The pistol was a kit gun, known colloquially as a ghost gun, that was unregistered and illegal to possess. The pistol had one round in the chamber and 19 rounds in the magazine. A ballistics analysis showed the pistol fired at least one of the shell casings found at the crime scene.

During a post-arrest interview, Martinez admitted she was in her car with Duran, Fakhoury, and Ponce on the day of Davis's killing. She told officers that the pistol recovered from the car's front passenger floorboard belonged to Duran. She also identified Duran as the shooter.

3. *Gang Evidence*

Detective Brian Caton, a member of the Riverside Police Department's Gang Intelligence Unit, testified as the prosecution's gang expert. He grew up in Riverside near the location of the shooting and learned about the city's gangs, including MGF, at an early age. Caton served as a patrol officer, a field training officer, an electronic weapons instructor, an active shooter response instructor, and a member of the force's Special Weapons and Tactics

5

(SWAT) team before being promoted to detective.  By the time of trial, he had been a law enforcement officer for eight years, he had served as a detective on the department's Gang Intelligence Unit for three years, and he had investigated over 100 crimes as a detective.

As of 2022, Duran was an active member of MGF who went by the gang moniker "Goofy."  According to Detective Caton, MGF is a Riverside gang composed mostly of Latino or Hispanic members.  MGF's main territory includes Garfield Street, Don Jones Park, and Hunt Park.  At the time of Davis's killing, MGF had about 30 to 40 members and associates.  MGF's common signs and symbols include the letter "M," the acronym "MGF," the word "Garfield," Garfield the cartoon cat, the number "643" (which corresponds to MGF on a telephone keypad), and the Milwaukee Brewers baseball team logo.

MGF's primary activities include unlawful possession of a firearm by a felon, robbery, assault with a deadly weapon (including firearms and non-firearm weapons), and murder.  To prove MGF satisfied the statutory definition of a criminal street gang whose members engage in, or have engaged in, a pattern of criminal gang activity, the prosecution elicited evidence of five predicate offenses perpetrated by alleged MGF members.  Those predicate offenses will be discussed below.  (See *post* III(B).)

MGF originated in the early- to mid-1990s in the Garfield Street area as a tagging crew called Man's Greatest Fear.  It evolved into MGF as its members began getting arrested and pledging their loyalty to the Mexican Mafia.  The Mexican Mafia is a prison gang consisting primarily of Latino or Hispanic members, which exists to protect its members from prisoners of other races.  If the Mexican Mafia recognizes a street gang as "good" or "righteous," it affords protection to the street gang's members when they

enter custody. To achieve good standing with the Mexican Mafia, a street gang must comply with the Mexican Mafia's requirements. One requirement is to pay "taxes" to the Mexican Mafia, which vary in amount based on factors like the size and activities of the street gang.

Black Star Mafia is a rival gang to MGF. As noted, Black Star Mafia consists primarily of members who are African American, and it uses the star logo of the Dallas Cowboys football team as a symbol. At the time of Davis's shooting, MGF and Black Star Mafia were engaged in a turf war over Hunt Park and Garfield Street, which both gangs claimed as their territories. Over the years, members of MGF and Black Star Mafia have perpetrated numerous assaults, violent attacks, and other crimes against one another.

When investigators were initially identifying the suspects in Davis's murder, they did not request the assistance of the Gang Intelligence Unit because they had no reason to believe Davis was a gang member. However, after they reviewed the neighbor's surveillance footage, they believed the shooting was gang-motivated because Davis was an African American man who was wearing a Dallas Cowboys jersey in disputed gang territory. According to Caton, MGF members typically perceive a person as their gang's enemy if the person wears attire associated with a rival gang.

When presented with a hypothetical scenario mirroring the facts of the case, Caton opined that the shooting would benefit MGF. He testified that the shooting of an apparent rival gang member in broad daylight would benefit MGF by eliminating a perceived "member of the enemy," and dissuading victims and witnesses from cooperating with law enforcement.

B. *Defense Case*

Duran took the witness stand and testified in his own defense. He denied having any knowledge about MGF, even though he had identified

himself as a member of MGF when he was taken into custody and had "MGF," "M," "Garfield," and "G street" tattooed on his face and body.

Duran admitted he was in the car that was parked near the crime scene prior to Davis's killing. However, he claimed not to know the identity of the driver, and denied that Martinez, Ponce, or Fakhoury were in the car with him. According to Duran, he first noticed Davis because of his "colors" and his "jersey," and because Davis was giving him "dirty looks." Duran testified that he believed Davis was a member of Black Star Mafia because he was wearing a Dallas Cowboys jersey. Duran also testified that Davis "said something" to him, "asked [him] where [he] was from, and it went from there." Duran admitted he shot Davis, but claimed he acted in self-defense.

## III

## DISCUSSION

### A. *Duran Has Not Established That the Trial Court Erred by Admitting Case-Specific Testimony from the Prosecution's Gang Expert*

Duran asks that we reverse his murder conviction and the related gang-murder special circumstance finding because the trial court erroneously allowed the prosecution's gang expert to relate case-specific testimonial hearsay to the jury. According to Duran, the admission of case-specific hearsay violated state law and contravened his constitutional rights under the confrontation clause of the Sixth Amendment. In response, the People contend Duran forfeited his constitutional argument by not objecting on this basis in the trial court, the gang expert did not relate case-specific hearsay to the jury, and any error was harmless. We agree with the People on all fronts.

#### 1. *Additional Background*

As noted, Detective Caton of the Riverside Police Department's Gang Intelligence Unit served as the prosecution's gang expert. During his

8

testimony, he described the existence of a rivalry between MGF and Black Star Mafia. Caton was aware of the rivalry because he grew up in Riverside, attended schools with members of both gangs, and investigated several cases involving both gangs.

After Caton discussed the racial composition of the gangs, the prosecutor asked him if violence and rivalry between the two gangs were common. Caton replied affirmatively. The prosecutor then questioned Caton whether members of either gang had given him information about racial tensions between the gangs, and he replied, "Yes." The prosecutor asked Caton whether he had learned specific information about "these two gangs … targeting one another or wanting to eliminate one another." Defense counsel asserted foundation and hearsay objections, which the trial court overruled.

Before Caton could answer the question, the prosecutor rephrased her question and asked Caton whether he had "ever receive[d] firsthand information from a gang member about the racial tension and elimination or desire of elimination between Black Star Mafia and MGF." Caton replied, "Yes." The prosecutor then asked what the gang member told him, prompting another hearsay objection that the court overruled.

Thereafter, Caton stated that he would "talk about one specific incident." He testified that he once spoke with an unidentified Black Star Mafia member while the gang member was being released from prison. According to Caton, he asked the man if his gang was "still having issues with MGF," and the gang member replied, "yes, and … he was trying to avoid them and trying to stay inside and not trying to get involved in anything, because he had recently heard that MGF was claiming that they were going to take out the trash …. MGF was telling people they were going to take out the trash." The prosecutor asked Caton if MGF considered Black Star Mafia

9

its trash, and he replied, "Yes.  So a Black Star Mafia gang member told me that MGF considered Black Star Mafia gang members their trash, and they were going to take out their trash.  Which I asked him what that meant, and he said that they're out to kill us."

### 2. *Legal Principles*

"[A] hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*); Evid. Code, § 1200, subd. (a).)  "Hearsay is generally inadmissible unless it falls under an exception." (*Sanchez*, at p. 674; Evid. Code, § 1200, subd. (b).)  An out of court statement relating another out of court statement constitutes multiple hearsay.  "[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149; Evid. Code, § 1201.)

"While lay witnesses are allowed to testify only about matters within their personal knowledge [citation], expert witnesses are given greater latitude." (*Sanchez, supra*, 63 Cal.4th at p. 675.)  "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc.  This latitude is a matter of practicality.  A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand." (*Ibid.*)  "The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Id.* at p. 676.)  Therefore, "an expert's testimony concerning his general knowledge, even if technically hearsay, has

not been subject to exclusion on hearsay grounds." (*Ibid.*; *People v. Valencia* (2021) 11 Cal.5th 818, 835 (*Valencia*) ["experts are given greater latitude to testify about matter beyond their personal knowledge because they are allowed to give an opinion on subjects 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], so long as the opinion is based on matter 'that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject' "].)

"By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) Further, "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) "The distinction between case-specific facts and background information thus is crucial — the former may be excluded as hearsay, the latter may not." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 26 (*Veamatahau*); see also *id.* at p. 30 ["the relevant hearsay analysis under *Sanchez* is whether the expert is relating general or case-specific out-of-court statements"].)

When distinguishing between case-specific hearsay and background facts, "[t]he focus of the inquiry is on the information conveyed by the expert's testimony, not how the expert came to learn of such information."

11

(*Veamatahau, supra*, 9 Cal.5th at p. 30; see *Valencia, supra*, 11 Cal.5th at p. 834 ["the distinction between background information and case-specific facts can depend, in part, on what the evidence, considered independently, is offered to prove"].) "Hallmarks of background facts are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases." (*Valencia,* at p. 836.)

"In gang cases, drawing the line of demarcation between background and case-specific information can present challenges." (*Valencia, supra,* 11 Cal.5th at p. 835.) However, " ' "[s]ince *Sanchez*, California appellate courts have held that expert testimony about 'the general attributes of the ... gang, such as the gang's culture, the importance placed on reputation and guns, ... *the gang's rivals and claimed turf*, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony.' " ' " (*People v. Barnes* (2024) 107 Cal.App.5th 560, 589, italics added, quoting *People v. Garcia* (2020) 46 Cal.App.5th 123, 167; see also, e.g., *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1138 ["Under *Sanchez*, [Officer] Cunnie's description of the two gangs' activities and their rivalry was admissible even though it was to a large extent derived from conversations with others or the review of police reports."]; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1247 ["Officer Barragan's expert testimony regarding … the gang's rivals and claimed turf[ was] permissible as expert background testimony."]; *People v. Meraz* (2018) 30 Cal.App.5th 768, 781–782 ["after *Sanchez*, Officer Adams was permitted to testify to non-case-specific general background information about Terra Bella[ and] its rivalry with Project Boys, … even if it was based on hearsay sources like gang members"], disapproved on another point by *Valencia,* at p. 839, fn. 17.)

12

"The admission of expert testimony is governed not only by state evidence law, but also by the Sixth Amendment's confrontation clause, which provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' " (*Sanchez, supra*, 63 Cal.4th at p. 679.) "[I]f an exception was not recognized at the time of the Sixth Amendment's adoption [citation], admission of testimonial hearsay against a criminal defendant violates the confrontation clause unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*Id.* at p. 680; see *Crawford v. Washington* (2004) 541 U.S. 36, 62, 68.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Sanchez*, at p. 689.)

"A trial court's evidentiary rulings, including those involving the hearsay nature of evidence, are reviewed for abuse of discretion." (*Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876; see *People v. Martinez* (2018) 19 Cal.App.5th 853, 858 ["We apply the abuse of discretion standard of review" to claims of state law error under *Sanchez*].)

### 3. *Analysis*

We begin with Duran's argument that the admission of the gang expert's testimony violated his Sixth Amendment right to be confronted with the witnesses against him. Duran interposed foundation and hearsay objections to the expert testimony in the proceedings below. However, he did not object that the testimony would violate his right under the confrontation clause. On appeal, the People contend Duran forfeited his constitutional claim by failing to assert a confrontation clause objection. We agree.

13

Evidence Code section 353 states, in part, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) " 'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433–434.) " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Id.* at p. 434.)

Because Duran did not assert a confrontation clause objection to the expert testimony at issue, he has forfeited his constitutional claim of error on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 730.) Further, Duran's hearsay and foundation objections did not preserve his federal confrontation clause argument, which "invokes different legal standards than" his state law arguments. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1217; see, e.g., *Redd*, at p. 730, & *id.*, fn. 19 [hearsay objection did not preserve confrontation clause argument]; *People v. Raley* (1992) 2 Cal.4th 870, 892 [same], superseded by statute on another ground as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8; *San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 574 [appellant's "hearsay objections in the trial court were insufficient to preserve [his] constitutional claim" under the confrontation clause].)

14

We now consider Duran's claim that the court erred as a matter of state law by allowing Detective Caton to relate case-specific hearsay to the jury. Duran challenges the admission of Caton's testimony that MGF believed Black Star Mafia gang members were trash and MGF wanted to "take out the trash," meaning that MGF wanted to kill members of Black Star Mafia. This evidence was clearly derived from a hearsay source—namely, out of court statements made by a Black Star Mafia member to Caton.[2] However, it did not relate case-specific facts to the jury; rather, it was background information of the type that is generally accepted as accurate by experts in the field, and thus admissible despite the fact it was derived from hearsay.

The challenged testimony did not specifically reference or relate to Duran or any of his accomplices from the shooting. It also did not mention or pertain to Davis or his shooting. Therefore, the gang expert's testimony revealed nothing about "the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) Instead, the prosecution offered Caton's testimony to prove the existence of a violent and ongoing rivalry between the MGF and Black Star Mafia gangs. Such testimony would be broadly applicable in other similar cases involving the two rival gangs. Further, Caton testified that he and other gang investigators routinely rely on personal conversations with gang members to learn critical information about their gangs, including interviews

---

[2]     Duran does not argue that the testimony included multiple hearsay. However, it arguably included multiple levels of hearsay insofar as it relayed both the Black Star Mafia member's out of court statements to Detective Caton, as well as certain unidentified MGF members' out of court statements that they believed Black Star Mafia members were trash.

with gang members after they have finished serving custodial sentences.[3] For all these reasons, we conclude the jury was entitled to rely on Caton's testimony about the rivalry between MGF and Black Star Mafia, which was admissible general background information.

Even if the trial court had violated state law by admitting Caton's testimony, the admission of the testimony would not warrant a reversal of the conviction because the testimony did not prejudice Duran. "We evaluate prejudice resulting from the allowance of expert testimony in violation of *Sanchez* under the standard of *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510; see *Valencia, supra*, 11 Cal.5th at p. 840 [erroneous admission of hearsay in violation of *Sanchez* is subject to *Watson* prejudice standard].)

Duran contends the admission of the challenged testimony prejudiced him because the existence of an active gang rivalry between MGF and Black Star Mafia was "crucial evidence" that demonstrated his motive and intent to kill Davis. We are not persuaded. Throughout trial, the prosecution elicited copious evidence of a violent and yearslong rivalry between MGF and Black Star Mafia, separate and apart from Caton's testimony that MGF members wanted to take out the trash, i.e. Black Star Mafia members. For example, Detective Caton presented thorough and unchallenged expert testimony that MGF and Black Star Mafia were rival gangs locked in a turf war over

---

[3]     Detective Caton testified that "a lot of our information comes from … talking to people that are actually living this life." Caton also explained that he had "talked to several hundred different gang members from different styles of gangs" during his investigations.

16

disputed territory, a fact of which he was aware based on his upbringing in the area and his "numerous investigations involving MGF and Black Star Mafia as both victims and suspects." In other unchallenged testimony, Caton provided examples of violent attacks and encounters involving members of both gangs. Detective Richard Kerr, another detective from the department's Gang Intelligence Unit, likewise testified about the "well-documented" rivalry between MGF and Black Star Mafia.

There was also ample evidence that Duran targeted Davis because he was wearing a Dallas Cowboys jersey and Duran mistakenly believed he was associated with Black Star Mafia. Detective Caton explained to the jury that Black Star Mafia uses the Dallas Cowboys star as its sign, and it is common for members of the gang to wear Dallas Cowboys attire. He also testified that an MGF member would believe a person wearing Dallas Cowboys attire in disputed gang territory is a rival gang member. In fact, Duran himself admitted Davis's "colors" and "jersey" caught his eye, and he believed Davis was a Black Star Mafia member because of his jersey. Further, when presented with a hypothetical mirroring the facts of the case—i.e., a shooting by MGF associates or members of an African American male wearing Dallas Cowboys attire in disputed gang territory—Caton opined that he believed the shooting would benefit MGF by "tak[ing] out a member of the enemy."

In short, the challenged testimony was cumulative of other evidence that established the existence of a violent rivalry between MGF and Black Star Mafia, the significance of the Dallas Cowboys jersey, the disputed nature of the territory in which the shooting occurred, and Duran's mistaken belief that Davis was associated with Black Star Mafia. Because the testimony at issue was cumulative, it is not reasonably probable Duran would have obtained a more favorable verdict if the court had excluded the

17

testimony.  (See *People v. Crew* (2003) 31 Cal.4th 822, 854 [error in admitting testimony was harmless because it was "cumulative of the testimony" of other witnesses]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 [expert testimony was "cumulative and therefore not prejudicial"]; *People v. Poletti* (2015) 240 Cal.App.4th 1191, 1208–1209 [any error in admitting evidence was harmless because it was "cumulative of other evidence"].)

B. *Substantial Evidence Supported the Special Circumstance Finding*

To prove the gang-murder special circumstance, the prosecution had to establish that MGF is a criminal street gang whose members collectively engage in, or have engaged in, a pattern of criminal gang activity.  (§§ 186.22, subd. (f), 190.2, subd. (a)(22).)  To meet this burden, the prosecution had to prove, among other things, that MGF members committed, or attempted to commit, at least two enumerated offenses under certain parameters for the common benefit of MGF, which was more than a reputational benefit. (§ 186.22, subd. (e).)  These offenses are known as predicate offenses.  At trial, the prosecution introduced evidence of five predicate offenses perpetrated by MGF members, including testimony from the victims of the predicate offenses, the investigating officers, and Caton.

On appeal, Duran contends there was insufficient evidence that MGF's members committed at least two of the proffered predicate offenses for the common benefit of MGF.  We reject this argument.  The prosecution elicited substantial evidence of at least two predicate offenses committed for the common benefit of MGF, evidence from which a rational jury could return a true finding on the gang-murder special circumstance allegation.

1. *Legal Principles*

"In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act or Act; … § 186.20 et seq.) to

18

eradicate 'criminal activity by street gangs.' [Citation.] Underlying the STEP Act was the Legislature's finding that 'California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods.' " (*Valencia, supra*, 11 Cal.5th at p. 828.) The STEP Act "created a sentencing enhancement for felonies committed 'for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 814 (*Cardenas*).)

Section 186.22, subdivision (f), defines a "criminal street gang" as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." "The prosecution must establish this ' "pattern of criminal gang activity" ' by showing 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more [enumerated] offenses,' also referred to as predicate offenses, under certain conditions." (*Cardenas, supra*, 18 Cal.5th at p. 814.)

Relevant here, the prosecution must prove the predicate offenses "commonly benefitted" the criminal street gang, and the common benefit must have been "more than reputational." (§ 186.22, subd. (e)(1).) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Id.*, subd. (g).) To prove these predicate offenses, the prosecution typically relies on "evidence of who committed the

19

crime and when they did so, as well as evidence of their gang membership and the nature of the crimes." (*Valencia, supra*, 11 Cal.5th at p. 830.)

The electorate "incorporated th[e] definition of a 'criminal street gang' set forth in Penal Code section 186.22, subdivision (f) when it added the gang-murder special circumstance to Penal Code section 190.2 through Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998 (as approved by voters, Primary Elec. (Mar. 7, 2000)). If it is found that the 'defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang,' the penalty for murder in the first degree is death or imprisonment for life without parole." (*Cardenas, supra*, 18 Cal.5th at p. 815, citing § 190.2, subd. (a)(22).) Here, the jury found true a gang-murder special circumstance allegation that Duran intentionally murdered Davis "while the defendant was an active participant in a criminal street gang, and that the murder was carried out to further the activities of the criminal street gang (MGF), within the meaning of Penal Code section 190.2, subdivision (a), subsection (22)," thus subjecting Duran to an aggravated LWOP sentence.

Duran challenges the sufficiency of the evidence supporting the gang-murder special circumstance finding. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] Even '[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission.' [Citation.] The same standard applies to special circumstance findings." (*Cardenas, supra*, 18 Cal.5th at p. 821.)

### 2. *Analysis*

To prove the gang-murder special circumstance, the prosecution introduced evidence of five predicate offenses perpetrated by confirmed or alleged MGF members: (1) a robbery from November 2017; (2) an unlawful possession of a firearm by a felon from August 2019; (3) the murder of Everest Avenue in April 2020; (4) an assault with a firearm from January 2022; and (5) the murder of Anthony Hayward in May 2022. We focus our attention on the two most recent predicate offenses, which are sufficient, standing alone, to affirm the gang-murder special circumstance finding.

### a. *January 2022 Assault with a Firearm*

The prosecution elicited testimony concerning the commission of the January 2022 assault with a firearm from three witnesses—(1) Abel M., the victim of the assault; (2) Nicholas Vazquez, a Riverside police officer who responded to the assault; and (3) Caton, the prosecution's gang expert.

Abel and Officer Vazquez told the following version of events. On January 4, 2022, at about 1:00 p.m., Abel was relaxing in his car at Hunt Park in Riverside. A car passed by Abel, and the front right passenger of the car—a man later identified as Elias Fakhoury—flashed gang signs at Abel. Abel understood the significance of the gang signs and wanted to show Fakhoury and his companions that he was not afraid. Therefore, Abel got out

21

of his car, threw his hands up in the air, and said, "Fuck your hood." The car stopped and Adrian T., a juvenile, exited the car and fired shots at Abel. Adrian returned to the car and it started to drive off, but Abel got back into his car and pursued his attackers. Soon after, the suspect car stopped again, and Adrian exited the car and fired another shot at Abel. Abel continued to follow the perpetrators and called the police. A patrol officer arrived and pursued the suspect car to Fakhoury's residence. The occupants of the car were Yaneli Martinez (driver), Fakhoury (front passenger), Adrian (backseat passenger) and a second female (backseat passenger). After his arrest, Adrian admitted to a charge of assault with a firearm and the juvenile court petition was sustained.

Caton was the gang investigator who responded to the assault. He opined that the assault benefited MGF in two ways. According to Caton, the assault benefited MGF because it demonstrated that MGF members do not "back down" or "let [it] slide" when someone challenges their gang; instead, they "respond in a violent manner." Caton testified that Abel challenged Fakhoury and Adrian, two known gang members, when he said, "Fuck your hood," after Fakhoury had thrown gang signs during their patrol of the disputed gang territory. Caton also testified that the assault benefitted MGF by intimidating witnesses at the park, allowing MGF members "to operate within the community and within their turf as violent gang members."

Drawing all reasonable inferences in favor of the judgment of conviction, we conclude a rational jury could rely on this evidence to find that the assault with a firearm commonly benefited MGF in a manner that was more than reputational. Based on the evidence that Fakhoury flashed gang signs at Abel in broad daylight while Fakhoury and his companions were armed and driving around in disputed gang territory, the evidence that Abel

22

responded to the display of gang signs by exiting his car, throwing his hands up in the air, and publicly disparaging MGF (by saying, "Fuck your hood"), and the evidence that Adrian exited his car and fired shots at Abel immediately after Abel had disparaged MGF, a jury could rationally find that Abel challenged MGF's show of authority and Adrian shot at him in retaliation for his refusal to cow to MGF's display of authority.[4]  By statute, "retaliation" is a common benefit that is more than reputational.  (§ 186.22, subd. (g); accord *People v. Mejia* (2012) 211 Cal.App.4th 586, 615 [substantial evidence showed crime benefitted gang where crime was "retaliation for the prior act of disrespect towards [the gang] and one of its members"].)  Thus, the evidence was sufficient to establish that the assault with a firearm commonly benefitted MGF in a way that was more than reputational.

b. *May 2022 Murder of Anthony Hayward*

The prosecution elicited testimony about the May 2022 murder of Anthony Hayward from Caton and Riverside Police Department Detective Melissa Brazil, who was the case agent on the Hayward murder investigation.

Brazil testified that a double homicide occurred on May 4, 2022, in an area of Riverside claimed by the Las Sierra Brown Knights gang.  Alexis Lua, an active member of Las Sierra Brown Knights, was one of the victims.  The

---

[4]    Duran argues that substantial evidence did not prove that Fakhoury and Adrian were "patrolling" the gang's territory, or that Abel was a "rival gang member."  Even if true, these claims are not dispositive.  Irrespective of whether Fakhoury and Adrian were "patrolling" the area when they displayed gang signs at Abel, or whether Abel was a rival gang member, there was sufficient evidence from which a rational jury could find that Abel challenged MGF's exercise of its authority by saying, "Fuck your hood," and that Adrian fired at Abel in retaliation for the challenge.

23

following day, a memorial service was held for Lua, which Lua's family members and several members and associates of Las Sierra Brown Knights attended. Frank O., Lua's 14-year-old cousin and a self-proclaimed member of MGF, was one of the family members who attended the memorial.

Video surveillance footage captured a physical confrontation between some of the women who attended the memorial. Hayward, an affiliate of Las Sierra Brown Knights, tried to de-escalate the fight. However, Frank confronted Hayward for reasons that are not apparent from the record. Hayward then told Frank they were in "Las Sierra Brown Knights territory," and said, "Fuck MGF." In response, Frank pulled out a gun and shot Hayward, killing him. Frank was arrested and admitted to Hayward's murder in juvenile court.[5]

Caton was the gang detective on the Hayward murder investigation and had personal knowledge about the investigation. Caton testified that MGF and Las Sierra Brown Knights were neither allies nor rivals at the time of Hayward's murder, as they occupied different areas of Riverside. Nevertheless, Caton opined that the murder benefitted MGF because Hayward had publicly "disrespected MGF" in front of other members and associates of Las Sierra Brown Knights. According to Caton, gang members

[5]    Duran claims the trial court erred by overruling the defense's hearsay objections to certain portions of Detective Brazil's testimony in which she supposedly "related hearsay witness statements to prove the facts underlying the murder." Our review of the reporter's transcript reveals Brazil did not relate inadmissible hearsay during the relevant portions of her testimony and the court therefore ruled correctly when it overruled the defense's hearsay objections. Relevant here, Hayward's out of court statement that they were in La Sierra Brown Knights territory was not hearsay because it was not introduced to prove the truth of the matter asserted—i.e., to prove La Sierra Brown Knights controlled the territory.

24

do not "let that slide," especially if they "are armed with a firearm." Instead, there is an expectation that they will respond with violence. Caton also opined that Hayward's murder benefited MGF by dissuading witnesses from cooperating with law enforcement or reporting the gang's illegal activities.

Viewing the evidence in the light most favorable to the judgment of conviction, we conclude a jury could rationally rely on this evidence to find that Hayward's murder benefited MGF as a form of retaliation. As noted, there was no evidence that MGF and Las Sierra Brown Knights were rival gangs at the time of Hayward's murder. However, there was substantial evidence that Hayward and Frank were involved in a heated confrontation at Lua's memorial service and, during the confrontation, Hayward disrespected MGF by saying, "Fuck MGF," in the presence of others. The evidence also showed that Frank killed Hayward immediately after Hayward disparaged MGF. From this evidence, a jury could reasonably find that Frank shot and killed Hayward in retaliation for his disparaging statement about MGF, and the murder therefore provided a common benefit to MGF that was more than reputational. (See § 186.22. subds. (e), (g).)

In sum, there was substantial evidence that MGF members committed the predicate crimes of assault with a firearm (January 2022) and murder (May 2022) for the common benefit of MGF, and the common benefit was more than reputational. Because only two predicate offenses were necessary to establish that MGF's members engaged in a pattern of criminal gang activity, we need not determine whether sufficient evidence supported the three other predicate offenses proffered by the prosecution.

C. *The Parole Revocation Fine Was Unauthorized*

As noted, the trial court sentenced Duran to prison for LWOP for the murder conviction, plus a consecutive indeterminate term of 25-years-to-life

for the firearm enhancement. The court also imposed and stayed a restitution fine of $10,000 (§ 1202.4, subd. (b)) and a parole revocation fine of $10,000 (§ 1202.45, subd. (a)).

Duran challenges the parole revocation fine. He contends a parole revocation fine is unauthorized where, as here, a defendant is sentenced to LWOP and an indeterminate life term without a determinate term. The People agree, and so do we. (See § 1202.45, subd. (a) ["In every case where a person is convicted of a crime *and his or her sentence includes a period of parole*, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount"], italics added; *People v. Alvarez* (2025) 18 Cal.5th 387, 484–486 [striking parole revocation fine where defendant was sentenced to death and indeterminate term]; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1182 [parole revocation fine unwarranted where defendant was sentenced to LWOP and indeterminate term].) Therefore, we strike the $10,000 parole revocation fine imposed under section 1202.45.

IV

DISPOSITION

The $10,000 parole revocation fine imposed under section 1202.45 is stricken. The judgment is affirmed as modified.

McCONNELL, P. J.

WE CONCUR:

DO, J.

KELETY, J.

26